PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

RICHARD ALFORD THORNBURG, JR.,

               Petitioner - Appellant,

v.

MIKE MULLIN, Warden of the Oklahoma State Penitentiary,

               Respondent - Appellee.

No. 04-6086

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CIV-00-1754-L)**

Steven M. Presson (Robert W. Jackson with him on the brief), of Jackson & Presson, P.C., Norman, Oklahoma, for Petitioner - Appellant.

Robert Whittaker, Assistant Attorney General (W. A. Drew Edmonson, Attorney General, with him on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.

Before **KELLY** , **HARTZ** , and **McCONNELL** , Circuit Judges.

**HARTZ** , Circuit Judge.

Applicant Richard Allen Thornburg was convicted in Oklahoma state court on three counts of first-degree murder and sentenced to death. After the Oklahoma Court of Criminal Appeals (OCCA) affirmed his convictions on direct appeal and denied his application for state postconviction relief, he filed in the United States District Court for the Western District of Oklahoma an application for writ of habeas corpus under 28 U.S.C. § 2254. The district court rejected his application.

The district court and a member of this court have each granted certificates of appealability (COA), see 28 U.S.C. § 2253(c)(1) (requiring a COA to appeal), permitting Mr. Thornburg to raise challenges to his conviction and sentence based on the following alleged errors: (1) the admission of testimony by a witness that he had passed a polygraph examination; (2) the failure of the trial court to give voluntary-intoxication and lesser-included-offense instructions; (3) the admission of hearsay testimony; (4) the admission of photographs of the deceased; (5) prosecutorial misconduct; (6) ineffective assistance of trial counsel; (7) ineffective assistance of appellate counsel; (8) the presence of a carving behind the judge's bench that contained eye-for-an-eye language; and (9) the denial of his request for an evidentiary hearing. We affirm.

## I.    BACKGROUND

### A.    The Crime

Between 3:00 and 4:00 a.m. on September 28, 1996, Thornburg, along with codefendants Glenn Anderson and Roger Embrey, went to Marvin Matheson's trailer.  All three were armed.  As they hovered over Matheson, Thornburg accused him of being responsible for shooting Thornburg the month before.  Also suspecting Jim Poteet of a role in the shooting, they drove Matheson to Poteet's house, telling him on the way not to worry about locking his trailer, because he was not coming back.

When the four men arrived at Poteet's house, Thornburg and Embrey went inside while Matheson and Anderson remained in the car.  After hearing gun shots from the house, Anderson took Matheson inside.  As Matheson entered he saw Terry Shepard sitting on a chair outside the bathroom door and Poteet sitting on the bed in the back bedroom.  Poteet, held at gunpoint by Thornburg, had been shot in the foot and his forehead was bruised and bloody.  Matheson saw Thornburg shoot again at Poteet's feet as he attempted to get Poteet to tell him who had shot him.

Anderson then instructed Thornburg to take Matheson to Poteet's rental unit near the house and get Jimmy Scott.  Thornburg escorted Matheson to the rental unit with a gun to his back, but he was interrupted when Kevin Smith

arrived at Scott's house to retrieve his girlfriend's purse. Thornburg instructed Smith to knock on Scott's door. The door was answered by Donnie Scott, the brother of Jimmy, who was not home. Thornburg forced Scott, Smith, and Matheson to go to Poteet's house.

Once they were inside Poteet's house, Anderson held the men at gunpoint in the kitchen while Thornburg went to the back bedroom. Matheson could hear Thornburg and Poteet arguing about drugs and money. Then Anderson instructed Embrey to bring everyone back to the bedroom. The men injected Matheson and Poteet with drugs, as Anderson commented that he intended to "OD" them. Tr. III at 94. Anderson and Thornburg also injected themselves. Thornburg continued arguing with Poteet about whether Poteet shot him. He told Poteet that he was going to shoot him, but then said "better yet, I ain't gonna shoot you," and instructed Matheson to shoot Poteet. Tr. III at 97. Embrey and Anderson pointed their guns at Matheson, threatening to shoot him if he did not shoot Poteet. When Matheson refused to shoot Poteet, Thornburg shot Poteet in the side.

Thornburg then told Matheson that Matheson was "going to shoot somebody and that it had a lot to do with if [Matheson left] the house or not." Tr. III at 100. Matheson was told to shoot one of the men in the bathroom. He attempted to shoot Scott in the head, but the gun did not have a bullet. Anderson took the gun into the hallway, presumably to put a bullet in it, and returned,

insisting that Matheson shoot Scott or he would kill Matheson. Matheson shot Scott in the chest.

Embrey then gave his gun to Anderson, telling him that he did not want to be involved in shooting anyone, and escorted Matheson back to the car. Matheson heard three or four more shots coming from the house. As Matheson was sitting in the car, Embrey opened the trunk and Matheson could smell gas as if Embrey was siphoning gasoline. The men removed a sack of "Longneck Budweiser" bottles from the back seat. *Id.* at 107. Then Matheson heard someone throw something through a window and saw that Poteet's bedroom window was broken. After setting the house on fire, the men drove away.

Thornburg dropped Anderson and Embrey off by the side of the road so that they could stash their guns. After driving further, Thornburg told Matheson to get out of the car, hide for a bit, and keep his mouth shut or the others would blame him for killing everyone.

Scott, still alive in the burning house, attempted to help Poteet crawl out but was unsuccessful. He made it out himself and lay down in the grass. A man and his son drove past the burning house shortly after 5 a.m. and saw Scott. They took him to a convenience store and called the police. Scott survived, but Smith, Poteet, and Shepard perished in the fire.

When Matheson heard that officers wanted to arrest him in connection with the murders, he turned himself in. He gave the above account of his activities to officers once he learned that his family was under police protection.

B.    **Court Proceedings**

During the guilt phase of Mr. Thornburg's trial, the prosecution presented the above account through the testimony of Marvin Matheson and Donnie Scott. The prosecution also called several other witnesses.

Richard Goss, a Deputy Inspector with the Oklahoma State Bureau of Investigation (OSBI), testified that Scott had identified Thornburg in a photographic line-up on September 28th, the day of the murders, as the "one that was giving the orders." Tr. III at 208.

To place the three perpetrators—Thornburg, Anderson, and Embrey—together at the time of the murders, and to confirm the time, the state provided four witnesses. Eric Huber was living with Anderson, who was his boss at a trailer manufacturing company. Huber testified that he, Anderson's wife, and Anderson's son joined Anderson, Thornburg, and Embrey at a bar until it closed about 2 a.m. the morning of the 28th. They then went to the house of Dana Nath, but left there by 3 a.m. Thornburg, Anderson, and Embrey left in Thornburg's car, while Huber, Mrs. Anderson, and the Andersons' son returned home. About

6 a.m. Huber was awakened when Thornburg dropped Anderson off at the home. Huber also testified that Anderson moved to a hotel "right after the homicides," Tr. II. at 231, and that while living at the Andersons' he discovered a box with newspaper clippings about the murders. In addition, he testified that at the Andersons' instructions he had originally told the police that Anderson went home with his family and Huber after they all went to the bar. He said that he had not told the truth to authorities until two days before his testimony.

Dana Nath agreed with Huber that the group came to her house after 2 a.m. the morning of the 28th, and stayed about half an hour. She thought Thornburg, Anderson, and Embrey left together between 2:30 and 2:45 a.m.

Roy Scott, the uncle of Donnie and Jimmy Scott, testified that he drove past the Poteet residence as he was on his way to his nephews' house about 4:30 a.m. on the 28th to pick up Jimmy to go to Oklahoma City. He noticed a light-colored car pulling into Poteet's drive (Thornburg's car was gold). At the time of his testimony, Roy Scott was in jail on a charge of possessing a stolen vehicle.

Jatone Kennedy, victim Smith's girlfriend at the time, testified that she and Jimmy Scott had been out drinking on the 27th. She passed out at the Scott residence. Smith, angry because she had not come home, woke her around 2:00 a.m. on the 28th, and they fought as they walked back to their house. Once

they reconciled, she told him that she had left her purse with his marijuana in it at Scott's house. About 4 a.m. he left to go to the Scott residence to get the purse. He never returned. Kennedy was on probation at the time of her testimony.

The state also called Loyd Keagans, one of the passers-by who rescued Scott. Keagans testified that he and his son left home at 5:05 a.m. on the 28th to see a football game in College Station, Texas. Shortly before 5:30 a.m. they passed by Poteet's house fully ablaze. They stopped to help. While Mr. Keagans approached the burning house, his son went to the neighboring house to use the telephone. On the way, the son discovered Scott, who insisted they take him to a hospital. They drove him to a nearby convenience store, where they called the Sheriff's Department. Although Scott's condition worsened while he was waiting for assistance at the convenience store, he was able to tell them that three white men were responsible, one "big" and one with "sandy hair," Tr. II at 112, and that there were three other people in the burning house who had been shot. Jeff Franklin, Chief of the Alex Police Department, testified that when he arrived at the convenience store, Scott told him that three or four people he did not know had shot him; one was tall, and one was a "heavy-set guy with long hair." *Id.* at 192.

The state also provided expert witnesses to describe the crime scene. Elvin Barnhill, an investigator with the State Fire Marshal's office, described what he

saw on the morning of the 28th. Shepard was found in the northeast bedroom, Poteet in the hallway leading to the two bedrooms, and Smith on the bed in the southeast bedroom. Barnhill detected evidence of the use of accelerants (flammable substances) to promote the fire in four spots in the northeast bedroom, and he discovered burn patterns indicating a flammable substance near Smith and between his legs. Although the laboratory detected no accelerants in the material samples from the bedroom, Barnhill explained that it was not uncommon for such substances to "leach[] out" during a fire. Tr. II at 72. He also testified that the charring of the victims' bodies and their surroundings indicated an intense heat, suggesting that accelerants were used in both bedrooms. The pattern of charring indicated that the fire started in the bedrooms and headed west down the hallway. Barnhill further explained how one could start a fire by breaking a bottle containing gasoline and a lit wick. Finally, Barnhill testified that the fire was likely set intentionally between 4:45 and 5:15 a.m. on the 28th.

Fred Jordan, Oklahoma's Chief Medical Examiner, testified that each victim had been shot and some showed signs of burning while still alive. He said that Poteet's fatal gunshot wound would not have caused instantaneous death, but he would have died from loss of blood and collapsing of the lungs. Likewise, the gunshots wounds to Shepard and Smith would not likely have caused instantaneous death. Jordan also testified about various wounds present on the

bodies, such as a gunshot wound on Poteet's left great toe. Susan Hart, a physical-evidence specialist and fingerprint examiner for the OSBI, testified that in Thornburg's car she found ammunition, a gallon jug, carburetor cleaner, a lighter, and Embrey's fingerprints. And Darwin Horman, a crime-scene investigator for the OSBI, testified that a Budweiser bottle was found in Poteet's driveway.

Julie Maxon, a long-time friend of Thornburg, testified that he had attempted to borrow her police scanner the night of the 27th, some six hours before the murders, and that he was unusually high that evening. She also testified to a prior incident in which Thornburg had been shot. The shooting occurred a few minutes after Thornburg had asked Jimmy Scott to pay him back $60 that he owed. Thornburg had told her that he thought Poteet had something to do with the shooting. Terry Alexander, a deputy sheriff who had investigated the September 23 shooting of Thornburg, testified that when asked about the shooting, Thornburg had told him "not to worry about it, he'd take care of it." Tr. III at 200.

A particularly unusual witness was Teresa Burgess, one of five patrons at the bar where Thornburg was arrested in the early morning of September 29. She was new in town and had never before seen Thornburg, but was sitting next to him. She overheard him say to himself, "[T]hree died last night and three more

will die tomorrow." Tr. III at 218. After Thornburg was arrested, officers interviewed all the patrons, and Burgess told them what she had heard.

Mr. Thornburg's sole defense was alibi. He testified that he had been out drinking with Embrey, became extremely intoxicated, blacked out, and woke up the morning of the murders in the back seat of his car at Embrey's house. He also testified that he had no recollection of making the remark overheard by Burgess. On cross-examination he maintained that he had no recollection of the early morning hours of the 28th, although he conceded that if witnesses said he was up and about at the Naths' house, then he probably was. When asked why Matheson and Scott would say he was at the crime scene, Thornburg replied, " I have no idea," continuing to maintain that he was not a participant in the murders. Tr. IV at 73.

The defense called three witnesses to support the alibi. Embrey's girlfriend, Ruby Davis, testified that when Embrey came home intoxicated at about 3 a.m., he told her that Thornburg was in his car asleep. When she left the house some four hours later, she saw Thornburg asleep in the car. Roy Thornburg, Mr. Thornburg's brother, and Terry Mainka, a friend of his brother, both testified that they were all at the bar drinking the night prior to the murders, and that they put Thornburg in the passenger side of a car at the end of the evening because he was incapacitated. Finally, Patricia Evans, who had known

Thornburg for 22 years, testified that as she passed the Poteet residence about 5 a.m. the morning of the murders, she saw two vehicles on the left-hand side of the road, and a man walking across the highway. She did not recognize the man as Mr. Thornburg, nor did she see his car.

The state called two rebuttal witnesses. OSBI Deputy Inspector Richard Goss impeached Ruby Davis. He testified that when he first interviewed her on October 2, 1996, she told him that Thornburg was not at her house the morning of September 28th. Then on October 9th she told him that she had not seen Thornburg at her house but had seen his car in her driveway. Goss also testified about a statement by Thornburg as he was arrested for the murders on the early morning of the 29th. When Goss informed Thornburg that he was being charged with three counts of first-degree murder, Thornburg replied: "[G]ood. Prove it, mother fucker. You couldn't get your keys if they were—you couldn't find your keys if they were stuck up your ass." Tr. IV at 78.

The final witness was Teresa Embrey, Roger Embrey's sister-in-law and neighbor. She had never been interviewed but called the OSBI the morning of her testimony because she "just th[ought] the truth need[ed] to come out." Tr. IV at 88. She testified that she was up at 5 a.m. the morning of the murders to say good-bye to her husband, who was going to work. When she looked across the road at Roger Embrey's house, Thornburg's car was not there. The only cars

were Roger's and Ruby Davis's.  When she looked again shortly before 8 a.m., Thornburg's car was there.

The jury convicted Mr. Thornburg on three counts of first-degree malice-aforethought murder, one count of first-degree arson, one count of shooting with intent to kill, and two counts of kidnapping.

At the penalty stage the prosecutor argued four aggravating factors in support of the death penalty: (1) the defendant knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) the defendant was a continuing threat to society.  In mitigation Mr. Thornburg presented the testimony of his wife and a medical expert who testified that he had organic brain damage and was subject to blacking out whenever he drank in excess.  The jury found all four aggravating factors on each murder count and returned a death sentence.  The entire trial, including jury selection and the penalty phase, took four days.

On direct appeal to the OCCA Mr. Thornburg was represented by new counsel.  The OCCA affirmed his conviction and sentence.  *See Thornburg v. State*, 985 P.2d 1234 (Okla. Crim. App. 1999).  Meanwhile, represented by his present counsel, he had filed a state postconviction application.  It, too, was denied by the OCCA.  After the United States Supreme Court denied certiorari

-13-

with respect to his direct appeal on May 15, 2000, he filed his federal application under 28 U.S.C. § 2254, setting forth 14 grounds for relief. The district court rejected his request for an evidentiary hearing and denied relief. He appeals.

## II.    DISCUSSION

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act (AEDPA) we may not grant Mr. Thornburg relief with respect to a claim adjudicated on the merits by the state court unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Moreover, factual determinations by a state court are presumed to be correct and the applicant has the burden of rebutting that presumption by clear and convincing evidence. *Id.* at § 2254(e)(1).

As the Supreme Court has recently reiterated,

> A state-court decision is contrary to . . . clearly established precedents if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. __, 125 S. Ct. 1432, 1438-39 (2005) (internal citations omitted). "Avoiding these pitfalls does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [those] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them" *Early v. Packer*, 537 U.S. 3, 8 (2002). Thus, when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard, we presume an adjudication on the merits and apply AEDPA deference. *See Harris v. Poppel*, 411 F.3d 1189, 1196 (10th Cir. 2005).

## B.     Admission of Polygraph Evidence

Mr. Thornburg first argues that his due-process right to a fundamentally fair trial was violated by testimony that Matheson had passed a polygraph examination. Our concern is not whether state rules of evidence were violated; we must confine ourselves to "deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The issue here is whether the challenged evidence "so infused the trial with unfairness as to deny due process of law." *Id.* at 75.

During his cross-examination of Matheson, Mr. Thornburg's counsel asked, "How long did you stay in jail?" Tr. III at 146. Matheson replied:

> Like four or five days and I gave a statement to them like when they
> arrested me in Alex they told me they'd give me a polygraph and if I

was telling the truth that they would let me out on an OR [own-recognizance] bond.

And I sat in jail five days or longer, I don't know, or less, I don't know, and I passed the polygraph and I come in front of the Judge here and got an OR bond.

*Id.* Although evidence of passing a polygraph examination is inadmissible in Oklahoma, *Birdsong v. State*, 649 P.2d 786, 788 (Okla. Crim App. 1982), Mr. Thornburg's counsel did not object to this testimony. Confining its analysis to plain-error review, the OCCA wrote:

We find that Matheson's reference to the polygraph test was a single, isolated response which was not solicited by defense counsel's question. Although Matheson's response was potentially prejudicial because he not only stated that he took the test but also that he passed the test, *this improper testimony was not unduly prejudicial* under the facts and circumstances of this particular case. This is because Matheson was not the only witness who testified about the events which are the subject of this case. Significant portions of Matheson's testimony were corroborated by Donnie Scott who also was witness to the events which occurred at Poteet's house. Given the evidence presented against Appellant at trial, we do not find that the improper mention of the polygraph examination rose to the level of plain error in this case.

*Thornburg*, 985 P.2d at 1242 (emphasis added). In short, the OCCA found no plain error because the improper testimony was not "unduly prejudicial."

Oklahoma's plain-error test is rooted in due process. Two years before its *Thornburg* decision the OCCA had stated:

As the right to a fair trial flows from the Due Process Clause of the state and federal constitutions, it forms the very foundation on which the criminal trial must be based. *See* Okla. Const. Art. II, § 7; U.S. Const. Amend. 14; *Massey v. Moore*, 348 U.S. 105, 106 (1954)

-16-

(Fourteenth Amendment requires fairness). Error which impinges on the fundamental fairness of trial is plain error.

*Cleary v. State*, 942 P.2d 736, 752-53 (Okla. Crim. App. 1997). We see no practical distinction between the formulations of plain error in *Thornburg* and *Cleary* and the federal due-process test, which requires reversal when error "so infused the trial with unfairness as to deny due process of law," *Estelle*, 502 U.S. at 75. Because the OCCA applied the same test we apply to determine whether there has been a due-process violation, we must defer to its ruling unless it "unreasonably appli[ed]" that test. 28 U.S.C. § 2254(d). It did not.

The prejudicial impact of Matheson's statement was somewhat limited because he did not indicate what portion of his testimony the polygraph found truthful and the prosecution made no mention of the polygraph at any later point in the trial. More importantly, Matheson's testimony was strongly corroborated in its essentials by the testimony of one of the victims, Scott (who even testified that Matheson had shot him), and the evidence of guilt could reasonably be viewed as overwhelming. The OCCA could reasonably have determined that Matheson's unsolicited, isolated comment regarding the results of his polygraph exam did not infect the trial with such unfairness as to deny Mr. Thornburg his Fourteenth Amendment right to due process. See *United States v. Blaze*, 143 F.3d 585, 594 (10th Cir. 1998) ("single unsolicited mention of a polygraph" did not merit mistrial due to other evidence of guilt established at trial); *United States v.*

-17-

*Tedder*, 801 F.2d 1437, 1445 (4th Cir. 1986) ("limited, inadvertent reference" to polygraph test did not entitle defendant to mistrial when jury had the opportunity to determine credibility through cross-examination, and other evidence supported defendant's guilt).

Mr. Thornburg relies on *United States v. Scheffer*, 523 U.S. 303 (1998), to contend that the introduction of the polygraph evidence is a *per se* violation of his constitutional right to a fundamentally fair trial. But his reliance on *Scheffer* is misguided. *Scheffer* held that the per se exclusion of polygraph evidence was not a constitutional violation because of the inherent unreliability of polygraph evidence. *Id.* at 312. *Scheffer* does not stand for the proposition that the introduction of polygraph evidence necessarily constitutes constitutional error.

### C. Failure to give voluntary-intoxication and lesser-included-offense instructions

#### 1. Voluntary Intoxication

Evidence at trial indicated that Mr. Thornburg was intoxicated at the time of the homicides. Marvin Matheson testified that Mr. Thornburg injected himself with "crank" at Poteet's house. Tr. III at 93-95. Mr. Thornburg testified that he had been drinking heavily on the day of the murders, and two other witnesses testified that he was extremely intoxicated or high that evening. Under Oklahoma law voluntary intoxication may be a defense to first-degree murder if the "person was incapable of forming [malice aforethought] because of [his] intoxication."

Okla. Unif. Jury Instructions-Criminal 8-36; *see Crawford v. State*, 840 P.2d 627, 638 (Okla. Crim. App. 1992).

Mr. Thornburg's trial counsel failed to request a voluntary-intoxication instruction, but he argues that the trial court should have *sua sponte* instructed the jury on the matter. The OCCA reviewed the failure to give such an instruction for plain error and affirmed. In light of Mr. Thornburg's proffered alibi defense, it held that "while [an] Appellant is entitled to an instruction on his theory of defense, he is not entitled to instruction on every possible theory of defense." *Thornburg*, 985 P.2d at 1243.

Mr. Thornburg asserts that he was entitled to a voluntary-intoxication instruction despite his alibi defense. He relies on *Mathews v. United States*, 485 U.S. 58, 63-64 (1988), for the proposition that a criminal defendant has a right to raise inconsistent defenses if they are supported by the evidence. Even accepting that proposition, however, we reject his claim.

We review the district court's failure to give an instruction *sua sponte* "only for the denial of fundamental fairness and due process." *Spears v. Mullin*, 343 F.3d 1215, 1244 (10th Cir. 2003), *cert. denied,* 541 U.S. 909 (2004). A voluntary-intoxication instruction was not necessary for the jury to acquit Mr. Thornburg because of intoxication. The instruction would not alter the elements of the offense. It would merely alert the jurors (and emphasize to them)

that one reason he might lack the requisite intent is that he was intoxicated. Although he claims that the trial court's failure to instruct the jury on the voluntary-intoxication defense relieved the state of its burden of proving specific intent beyond a reasonable doubt, the jury was informed that it could convict him of first-degree murder only if it found beyond a reasonable doubt that he possessed malice aforethought. And the trial court provided the following definition of *malice aforethought*:

> 'Malice aforethought' means a deliberate intention to take away the life of a human being. As used in the Instructions, 'malice aforethought' does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before the commission of the act.

Instruction 9, St. Ct. R. Vol. III at 458. The jury was not prohibited from evaluating Mr. Thornburg's intent in light of his intoxication. The jury could have heard the evidence of intoxication, decided he lacked the requisite intent, and acquitted him. A voluntary-intoxication instruction might have helped him, but it was by no means essential to the jury's considering the matter. *See Hill v. Mitchell*, 400 F.3d 308, 322-23 (6th Cir. 2005) (absence of intoxication instruction does not establish that state failed to prove mental element of crime beyond a reasonable doubt); *see also Hendersen v. Kibbe*, 431 U.S. 145, 153-55 (1977) (trial court's failure to give instruction explaining causation element did

not justify reversal); *Foster v. Ward*, 182 F.3d 1177, 1193-94 (10th Cir. 1999) (trial court's failure to give unrequested cautionary instruction on accomplice testimony did not render trial fundamentally unfair). In short, failure to give an unrequested voluntary-intoxication instruction did not render Mr. Thornburg's trial fundamentally unfair.

### 2. Lesser-Included-Offense Instruction

Mr. Thornburg also contends that the trial court should have *sua sponte* instructed on the lesser included offense of first-degree manslaughter. *See Beck v. Alabama*, 447 U.S. 625 (1980) (defendant entitled to requested lesser-included-offense instruction when evidence warrants it). But this court has repeatedly held that "a state prisoner seeking federal habeas relief may not prevail on a *Beck* claim as to a lesser included instruction that he or she failed to request at trial." *Hooks v. Ward*, 184 F.3d 1206, 1234 (10th Cir. 1999); *Spears v. Mullin,* 343 F.3d at 1245 (failure to request lesser-included-offense instruction precludes habeas relief).

To the extent that Mr. Thornburg argues that Oklahoma's capital-punishment statute is unconstitutional because *Beck* requires a lesser-included-offense instruction for every capital charge, we disagree. *Beck* says only that a court must provide a lesser-included-offense instruction if the evidence supports the lesser included offense. *See Beck*, 447 U.S. at 630. The Supreme Court

-21-

foreclosed Mr. Thornburg's present argument in *Hopkins v. Reeves*, 524 U.S. 88 (1998), when it held that *Beck* did not require "state trial courts to instruct juries on offenses that are not lesser included offenses of the charged crime under state law," even if the jury is left with only the option of convicting or acquitting. *Id.* at 90. There the defendant was convicted of felony murder, a crime for which second-degree murder and manslaughter were not lesser included offenses under Nebraska law. Because there was no lesser included offense that the evidence would support, the trial court's failure to offer a lesser-included-offense instruction did not result in any constitutional error.

Here, the OCCA held that "[t]he evidence did not warrant instructions on First-Degree Manslaughter as there was no evidence of adequate provocation which is required to support a conviction for this crime." *Thornburg*, 985 P.2d at 1243. Because Oklahoma's manslaughter statute as interpreted by the OCCA on this occasion requires evidence of provocation—evidence that was not present in this case—the failure to give the instruction did not violate *Beck*.

### D.     Hearsay Statements

Mr. Thornburg contends that several hearsay statements by his codefendants were elicited by the prosecutor in violation of his Sixth Amendment right to confrontation. The state counters by asserting that (1) some of the statements were not hearsay, and (2) those that were did not prejudice

Mr. Thornburg. Trial counsel did not object to the statements and the OCCA, while agreeing that some of the statements were hearsay, concluded that their admission did not rise to plain error. *Thornburg v. State*, 985 P.2d at 1243. The OCCA stated, "In addition to the few hearsay comments which indicated codefendants' intent to kill the victims, there were numerous of [Mr. Thornburg's] own statements properly admitted into evidence which indicated his same intent." *Id.* As we proceed to explain, we hold that most of the statements were properly admitted, and agree with the OCCA that any constitutional error arising in the admission of the statements caused no harm to Mr. Thornburg.

Mr. Thornburg asserts that the following statements, all introduced through the testimony of Matheson, violated his right to confrontation: (1) upon leaving his trailer, codefendant Anderson instructed Matheson "not to worry about locking [his] trailer, [he would] never come back," Tr. III at 73; (2) Anderson, while arguing with Poteet, said that they were far enough in the country to settle their score; (3) Anderson said that he was going to overdose them before giving the victims drugs; (4) Anderson insisted that Matheson shoot Scott, or Anderson would kill him (Matheson); (5) Embrey said that he did not want to be involved in shooting anyone; (6) Anderson told Mr. Thornburg that he thought the house would burn, and (7) Embrey responded that they could burn it because he had

-23-

gasoline; (8) after recognizing a silver lighter at Poteet's house, Anderson said that someone had stolen it from him; and (9) after setting fire to the house, Anderson, over Mr. Thornburg's protests, commented that he still wanted to burn and kill Matheson.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). *See* 12 Okla. Stat. § 2801(A)(3) (same). With the possible exception of statements (7) and (8), each statement either was not offered to prove the truth of the matter asserted or was admissible under an established exception to the hearsay rule for statements offered to prove the declarant's state of mind. *See* Fed. R. Evid. 803(3) (state-of-mind exception); 12 Okla. Stat. § 2803(3) (same). The statements were probably offered just to complete the narrative, and at most were offered to show that Thornburg was on notice that Anderson was intent on committing violence—a use that is independent of the truth of the statement of intent and thus is not hearsay. Statement (1) was not offered to prove that Matheson would not come back to his trailer (he did return); statement (2) was not offered to prove how far in the country they were; nor was statement (3), which was admissible to prove Anderson's intent to overdose the victims, offered to prove that anyone was overdosed (no one was). Statement (4) was an order. *See United States v.*

-24-

*Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) (orders are not hearsay because they are not offered for their truth). Statement (5) was irrelevant, and at most could have been offered to prove Embrey's state of mind. Similarly, statement (6) was not offered to prove Anderson's belief that the house would burn; and statement (9) was not offered to prove Anderson's murderous intent (Matheson was not harmed). Perhaps statement (7) was offered to prove that the perpetrators had gasoline and statement (8) was offered to prove that Poteet had stolen Anderson's lighter; but the statements could hardly have affected the outcome of the trial. The OCCA's ruling was eminently reasonable.

**E.    Photographic Evidence**

During the testimony of its expert witnesses in the guilt phase of the jury trial, the state introduced six photographs depicting the charred remains of the victims' bodies, as and where they were found. Mr. Thornburg objected to the photographs in an *in camera* hearing before the trial judge, arguing that he had no plans to dispute the manner of death and that they served solely to inflame the jury. The trial court overruled the objection. Mr. Thornburg contends that the introduction of these gruesome photographs deprived him of a fundamentally fair trial and due process of law in violation of the Sixth, Eighth, and Fourteenth Amendments. The OCCA, reviewing his claims on the merits, held that the photographs were "probative insofar as they corroborate the medical examiner's

testimony, depict the crime scene and establish corpus delictis." *Thornburg*, 985 P.2d at 1244. Although the OCCA found the photographs "disturbing," it held that their prejudicial effect did not substantially outweigh their probative value. *Id.*

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999). The appropriate inquiry in this proceeding is whether the admission of the photographs rendered the proceeding fundamentally unfair. *Id.* at 1275.

Mr. Thornburg pleaded not guilty. Even if he did not dispute the manner of death, the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events. The photographs corroborated their accounts. Indeed, Mr. Thornburg's defense counsel, in his guilt-phase closing argument, conceded that "to prosecute a case like this it makes sense to show the photographs, and they're graphic." Tr. IV at 122.

Perhaps we would not have admitted such evidence had we been sitting on the trial bench, but our role is a very limited one. Reviewing the record under AEDPA's constraints, and in light of the probative value of the pictures, the gruesome nature of the crime, and the other evidence incriminating

Mr. Thornburg, we cannot conclude that the OCCA acted contrary to or unreasonably applied federal law in concluding that their admission was proper.

Mr. Thornburg relies on our recent ruling in *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003), *cert. denied*, 541 U.S. 909 (2004), to argue that the admission of the photographs in the guilt phase of the trial carried over to the sentencing phase and unfairly persuaded the jury to sentence him to death. But *Spears* is not apposite. In *Spears* photographs depicting the victim with 50 to 60 stab wounds were offered in the sentencing phase of a capital trial to prove conscious physical suffering. We held that the photographs were not probative for that purpose in light of the uncontradicted evidence that the victim died or lost consciousness early in the beating. *Id.* at 1227-28. Unlike the situation here, there was no logical connection between the photographs and the proposition they were offered to prove.

### F.     Prosecutorial Misconduct

Mr. Thornburg contends that a multitude of the prosecutor's statements during the guilt and sentencing phases of trial were improper and had the cumulative effect of rendering his trial fundamentally unfair and his sentence unreliable. His trial counsel made no objection to any prosecutorial comment, and the OCCA reviewed the contested comments for plain error. Without enumerating each specifically contested comment, the OCCA concluded: "We

-27-

find that many of the comments complained of fell within the prosecutors' wide range of permissible argument. We also find that those comments which were inappropriate were not so egregious as to rise to the level of plain error." *Thornburg*, 985 P.2d at 1244-45. Mr. Thornburg concedes in his appellate brief that, viewed in isolation, the comments would not have risen to constitutional error. Instead, he asserts that their cumulative effect rendered the trial fundamentally unfair.

We therefore do not address each comment to determine whether it alone rendered the trial unfair. Our course will be to analyze each comment to determine the risk of unfair prejudice and then decide whether the cumulative impact of any errors rendered the trial unfair. We begin by distinguishing the challenged comments that were proper from those that may have been improper and should be included in the cumulative-error analysis. Because the OCCA did not identify the comments it thought improper, we conduct our own independent review of the record and federal law.

### 1. Comments Not Improper

#### a. Discussing Reasonable Doubt

During voir dire the prosecutor made the following comments:

In a criminal case we have to prove the defendant guilty beyond a reasonable doubt. In a civil case it's beyond a preponderance of evidence. Do you understand the distinctions?
 . . .

-28-

> And we can't tell you what reasonable doubt means. We can't define it for you. Defense can't define what beyond a reasonable doubt means. And the Court can't define it.
>
> *The instructions won't say beyond a shadow of a doubt or all doubt. The Instructions say beyond a reasonable doubt.*

Tr. I at 121 (emphasis added) (similar comments at 125). Although Oklahoma law does not permit jury instructions on the meaning of "reasonable doubt," *Al-Mosawi v. State*, 929 P.2d 270, 279 (Okla. Crim. App. 1996), and an instruction defining reasonable doubt may deny due process if it misleads the jury about the burden the state carries, *see Cage v. Louisiana*, 498 U.S. 39, 41 (1990) (instructions equating "reasonable doubt" with "grave uncertainty" and "actual substantial doubt" violate due process), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 73 n.4 (1991) (clarifying that standard of review for erroneous jury instructions is whether they had a "reasonable likelihood" of misleading the jury), not all definitions of reasonable doubt are misleading. The Supreme Court held in *Victor v. Nebraska*, 511 U.S. 1, 17 (1994), that a jury instruction stating that a reasonable doubt "*is not a mere possible doubt*" did not likely mislead the jury "because a *reasonable doubt*, at a minimum, is one based upon *reason*. A fanciful doubt is not a reasonable doubt." (internal citation and quotation marks omitted). Similarly, to state that "beyond a reasonable doubt" does not mean beyond "a shadow of a doubt or all doubt" was not a constitutional violation.

### b. Eliciting Evidence of Codefendant's Attempt to Influence Witness Huber

Mr. Thornburg contends that the prosecutors improperly elicited testimony from state witness Eric Huber that codefendant Anderson and his wife had attempted to get him to provide a false statement to the police. Huber testified that Anderson, Embrey, and Thornburg left the Nath house together at 3:00 a.m. on the 28th and that Anderson was dropped off at his house about 6 a.m. by a gold car resembling Thornburg's. Huber, however, had made a contrary statement to police officers when he was first interviewed. Such a prior inconsistent statement is often used by opposing counsel for impeachment. And to reduce the impact of the impeachment, counsel may elicit the prior statement on direct examination and allow the witness to explain. That is what happened here:

> Q. [Prosecutor]. Sir, did you give a different statement than what you've told this jury and law enforcement when you were interviewed?
> A. [Huber]: Yes, sir. I did.
> Q. That was back in October 3rd of 1996?
> A. Yes, sir.
> Q. What statement did you give them?
> A. I stated in that report that Glenn—Mr. Anderson rode home with me, his wife and his son and that I drove, and that was a lie.
> Q. So basically you gave an alibi at that time.
> A. Yes, sir. I did.
> Q. Who told you, sir, to tell OSBI that statement—that story?
> A. Mr. and Mrs. Anderson.

Tr. II at 230-31. There is, of course, always the possibility that defense counsel would not have tried to impeach Huber with the prior statement, in which case the

-30-

misconduct of the Andersons should have been inadmissible. But if defense counsel wished to adopt that course, he needed to object to the direct examination concerning the prior statement. We see no impropriety in the prosecutor's anticipation of likely impeachment, absent something in the record indicating that defense counsel would forego the impeachment.

### c. Prosecutorial Speculation and Inference

Mr. Thornburg also contends that the prosecutor speculated and argued facts not in evidence when he claimed that accelerants were used in starting the fire, that other jugs of gasoline may have been present in Mr. Thornburg's car that night, and that but for the two passers-by who discovered Scott, there would have been four, not three, deaths. A prosecutor may comment on and draw reasonable inferences from evidence presented at trial. See *Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002), *cert. denied,* 540 U.S. 838 (2003). Undisputedly, the house was set on fire. The fire inspector testified that he detected four spots in the debris showing evidence of accelerants, and a photograph admitted into evidence showed a plastic jug in the back seat of the gold car driven by Mr. Thornburg. It is not beyond the pale to infer from this evidence that accelerants had been used to start the fire and that other containers of flammable substances had been present in the car that night. It was also reasonable for the prosecutor to imply that Scott, who was left seriously wounded in a burning

-31-

house, may not have survived if he had not been rescued by the passers-by. These comments were not improper.

### d. Demeaning Mitigation

Mr. Thornburg also argues that the prosecutor improperly demeaned his mitigation evidence as "excuses." Tr. IV at 199-202. We disagree. The prosecutor used the word *excuse* on two occasions. The first time, the prosecutor was merely incorporating the word excuse as employed by defense counsel in his closing argument moments before: "Not saying the alcohol isn't a defense in the sense of an excuse. There is no excuse. We're asking you for mercy . . . ." *Id.* at 199. In response the prosecutor said, "The State and defense counsel have one thing in common. Defense counsel just said there are no excuses. Folks, there's not. There cannot be excuses for what these three men suffered." *Id.* at 199-200.

Further along in his argument, the prosecutor again referred to the mitigation evidence as excuses but this comment was equally proper because the prosecutor was commenting on the express language of the jury instructions. The mitigation instructions specified that the jury could consider evidence produced by Mr. Thornburg that he "acted under circumstances which tended to justify, excuse or reduce the crime." St. Ct. Rec. at 503. The prosecutor said, "What facts have you heard that justify, excuse or reduce this crime? Any? Any of the excuses?" Tr. IV at 201. This characterization of the mitigation evidence,

invited as it was by the jury instructions and defense counsel, falls easily within the wide latitude of argument allowed to prosecutors.

### 2. Possibly Improper Comments

Mr. Thornburg complains of other prosecutorial comments that are at least arguably improper. We will address them individually before considering whether their cumulative impact demands reversal.

### a. Improper Witness Vouching

Mr. Thornburg contends that in final argument the prosecutor (1) improperly vouched for state witnesses by claiming that Donnie Scott, Teresa Burgess, and Teresa Embrey (codefendant Embrey's sister-in-law) had "no reason to lie," Tr. IV at 105-107; and (2) accused Ruby Davis of perjury when he said:

> Let's talk about the Embreys and Ruby Davis. What motive does she have to get up here and lie to you? When she first talks to OSBI she never sees Richard Thornburg out there. Never at all. She sticks to the story about Mr. Embrey coming home and falling off the couch.
> Second interview she never sees Mr. Thornburg there. . . . Second interview she throws in he was a big boy. I told him to stay away from those people.
> What is she not saying in that statement? Yet, *she comes in here* in front of you and testifies, *commits perjury on the stand*, lies to you and says she never said those things. She said she was never asked. What motive does she have to testify? Her boyfriend, Roger Embrey, her friend Richard Thornburg.

*Id*. at 107-08 (emphasis added).

"Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005) (internal quotation marks omitted). Likewise, an attack on a witness's veracity is improper only in similar circumstances. Thus, it is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility.

Here, the prosecutor's statements appeared to be based on the evidence. Nothing at trial suggested any reason why Scott, Teresa Embrey, or Burgess would want to injure Mr. Thornburg. Also, the attack on Ms. Davis was explicitly based on her prior inconsistent statements to police officers.

Moreover, the prosecutor never indicated to the jury that he knew something more about the witness's credibility than could be deduced from the evidence at trial. Hence, this does not appear to be a case of improper vouching. Even if, in an (over)abundance of caution, we might say that the prosecutor stepped over the line, *see United States v. Broomfield*, 201 F.3d 1270, 1276 (10th Cir. 2000) (assuming prosecutor's characterization of case as "case about perjury," defense witness's testimony as "lies," and argument that state witness

"[had] no reason to lie" was improper vouching but deciding that any error was harmless), we would still be hard-pressed to find any substantial unfair prejudice.

### b. Commenting on and Eliciting Evidence of Codefendant's Attempt to Influence Witnesses

Mr. Thornburg contends that the prosecutor improperly elicited testimony that the Andersons tried to influence the testimony of Jatone Kennedy, victim Smith's girlfriend. Kennedy testified that Smith went to get her purse from Scott's house about 4 a.m. on the 28th and that she never saw him again. On direct examination the prosecutor asked:

> Q. Ma'am, has anybody approached you in this case about your testimony?
> A. No.
> Q. Nobody has?
> A. I think in the beginning there were some people that tried to convince me to say things differently than —I mean, nobody—
> Q. Nobody twisted your arm.
> A. Right
> Q. Who approached you, ma'am, about this case?
> A. Corky [Mrs.] Anderson.

Tr. II at 216. In contrast to Huber, Kennedy had uttered no prior inconsistent statement.

Mr. Thornburg further complains that the prosecutor stated in closing: "[Mr. Huber] also told you Corky Anderson tries to influence his testimony, Corky and Glenn. And first she lied and gave a story that Glenn went home with

-35-

them. . . . Why are you creating alibis? Why do you have to create a situation if you haven't done anything wrong?" Tr. IV at 103.

We agree with Mr. Thornburg that it may have been improper for the prosecutor to elicit Mrs. Anderson's attempt to influence Kennedy or to argue that Anderson's attempt to create an alibi was evidence of Mr. Thornburg's guilt.

The state makes no real attempt to justify the conduct. Nevertheless, the real damage to Mr. Thornburg's alibi defense came from the testimony of government witnesses regarding the events at the time of the murder, not evidence regarding the Andersons' apparently feeble attempts to influence witnesses.

### c.  Appeal to Moral and Civic Duty of Jury

Mr. Thornburg also complains that during the guilt phase the prosecutor argued that the jury had a moral and civic duty to convict:

> Justice is in your hands. *Your decision here affects the lives of not only this defendant but other people in the community.* We've shown you overwhelming evidence of why Mr. Thornburg would want to kill Mr. Poteet, why maybe he would want to kill Jimmy Scott, his motive, waited the night before, the next morning, his statements to Richard Goss when he was arrested.
> Does that sound like meek, little, mild statements the testimony you heard from Mr. Thornburg up here? I will suggest to you that was the true Mr. Thornburg. With all the cuss words you can't prove it. He didn't say I'm innocent. What are you talking about? He said, you can't prove it. Folks, we have proven it. It's right here in front of you right now.
> We talked about it in voir dire. We asked the question about passing judgment on somebody else. And that's a hard thing to do. Each of you in voir dire told us you could pass judgment. We've proven our case to you. We've shown it to you.

-36-

We've woven it together. Every little piece has fallen right in line. We've shown our case to you, said this is what we've got, this is the evidence.

One of you just got through reading a book before you came on here, *When Justice Prevailed*. Folks, *justice must prevail in this case*. Like I said, you're the ones that decide it. *You are the justice in Grady County right now*. You're the ones that make the legal decisions.

*Justice must run in this case for three victims*, for Donnie Scott. Mr. Thornburg has got to be told what he did was wrong. Not only was it wrong, this was terrible, folks.

One of you said about mass murder. *One of the problems in our society is mass murder, violence, drugs, guns*. This is a mass murder. This is three helpless people who were gunned down, kidnapped tortured, burned alive and left dead in a house.

Tr. IV at 112-113 (emphasis added). It is improper for a prosecutor to suggest that a jury has a civic duty to convict. *See Spears v. Mullin*, 343 F.3d 1215, 1247 (10th Cir. 2003), *cert. denied,* 541 U.S. 909 (2004). In a decision handed down during World War II, the Supreme Court warned that the prosecutor's references to the war constituted "an appeal wholly irrelevant to any facts or issues in the case," and could have jeopardized the verdict had the Court not reversed on another ground. *Viereck v. United States*, 318 U.S. 236, 247-48 (1943). But here the prosecutor's comments were firmly rooted in the facts of the case. We see little, if any, impropriety. *See Spears*, 343 F.3d at 1247 (statement that "justice cries out for [conviction]" did not render trial fundamentally unfair); *Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002) (prosecutor's comment that jury "could only

do justice . . by bringing in a verdict of death" did not render trial fundamentally unfair), *cert. denied,* 540 U.S. 833 (2003).

### d.  Misstatement of the Evidence

Mr. Thornburg complains of prosecution comments about the defense's punishment-phase expert, Dr. Philip Murphy, a clinical psychologist.  Dr. Murphy testified that excessive drinking and other injuries caused Mr. Thornburg's organic brain damage that led to blackouts during which he would lose consciousness.  Dr. Murphy performed 11 tests and a clinical interview to assess Mr. Thornburg.  In his closing argument at the sentencing phase of the trial, the prosecutor said: (1) "You heard Dr. Murphy.  He spent 15 minutes looking at him and he said he's brain damaged?" Tr. IV at 200; and (2) "Dr. Murphy says that Richard Thornburg, as long as he's not drinking and in these blackouts, he's not a dangerous man.  This is, of course, from his 15 minutes upstairs in jail."  Tr. IV at 203-04.  But nowhere in the record is there evidence about the amount of time Dr. Murphy spent with Mr. Thornburg.  A prosecutor is allowed to comment on the evidence and draw inferences therefrom, but he may not speculate or refer to evidence never presented to the jury. *See Le v. Mullin*, 311 F.3d at 1020-21 (criticizing prosecutor for mischaracterizing evidence and suggesting that defendant had committed other murders when such facts were not in evidence). The prosecutor's 15-minute comments were improper.

On the other hand, defense counsel never objected to these statements. Also, the judge instructed the jury that it should consider only the evidence introduced at trial, that the attorneys' statements and arguments are not evidence, and that the jury bore the responsibility of determining the credibility of each witness. Such instructions may minimize the impact of a prosecutor's misstatements. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (jury instructions that "their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence" helped remedy prosecutor's improper closing argument).

### e. Comments on the Appropriate Sentence

Mr. Thornburg contends that the sentencing stage of his trial was fundamentally unfair because in his sentencing-stage closing the prosecutor (1) injected his personal opinion on the appropriate sentence and (2) misled the jury about sentencing alternatives. The prosecutor said:

> And you must give independent consideration to each and every one of the murder convictions because every one of those individuals in there was a separate life, and that is they never deserved to die in the manner in which they died.
>     And we can't change that. But I can and you can give them at least individual consideration with the understanding that the man who murdered them, the man who led, the man who created this and the man who was out seeking for revenge that night, that he receive the punishment that is just under the statutes, under the law and most important in this case, as we discussed at the very beginning.
> . . .

And we told you what the law is. That's merely the charges we file against somebody. But that's not easy. There's nothing easy about it. You know, we all try to be moral people, we think about trying to do good for our community, our society.

When we file a piece of paper, we're asking you to sentence this person to death. We're asking you to return a verdict allowing the State to execute Mr. Thornburg. So basically we're asking you the State for the authority to do that. There's nothing easy about that. We're talking about life and death. Nothing easy at all.
. . .

Justice, folks, cries for the death penalty in this case like no other case. Justice cries for the death penalty. There is no other reasonable verdict, nothing. Nothing can come close.

Talk about the sword of mercy. It's above Judge Winchester. The sword there. You live by the sword, you die by the sword, folks. We're asking you to return a verdict now of guilty which you already have. The maximum punishment is on everything.

If you really don't want Mr. Thornburg back on your streets ever again, then the only proper punishment is death. We're asking you to sentence Mr. Thornburg to that. It should not be a difficult decision. I know it is. We're talking about killing somebody. You're authorizing the State to kill somebody. But there is no other just verdict. This is justice.

Tr. IV at 195-96, 201-02, 205-06. Mr. Thornburg contends that these comments imposed the prosecutor's personal views upon the jury. It is improper for a prosecutor to inject his personal opinion on the propriety of the death sentence. It is also impermissible for a prosecutor to suggest that he "or some other authority, not the jury, [is] the final or true arbiter of . . . punishment." *Sellers v. Ward*, 135 F.3d 1333, 1343 (10th Cir. 1998) (internal quotation marks omitted). As stated in *Caldwell v. Mississippi*, 472 U.S. 320, 333 (1985), "[T]he uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others

-40-

presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." But a prosecutor is entitled to argue that under the facts and law, capital punishment is appropriate. *See United States v. Ainesworth*, 716 F.2d 769, 771 (10th Cir. 1983) (distinguishing improper argument that prosecutor believes accused is guilty of crime or stating facts not in evidence from proper commentary that "on the basis of the evidence in the case, it is his belief that the defendant is guilty"). Here, the prosecutor did not suggest the existence of facts not in evidence, nor did he suggest that anyone other than the jury was responsible for fixing the appropriate sentence. On the other hand, his comments on the appropriateness of the death penalty could be taken as his personal view. We will assume that the comments crossed the line.

More troubling is the prosecutor's comment that did cross the line. In the last quoted paragraph he said, "If you really don't want Mr. Thornburg back on your streets ever again, then the only proper punishment is death." Tr. IV at 205. This statement could mislead the jury about possible punishment alternatives, suggesting that he could be released from jail at some point if not sentenced to death. "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released" if given a sentence other than death. *Simmons v. South Carolina*, 512 U.S. 154,

171 (1994) (jury should have been instructed on possibility of life without parole); *see also Kelly v. South Carolina*, 534 U.S. 246 (2002) (requiring Simmons instruction when prosecution presented evidence showing defendant's probability of future dangerousness).

Nevertheless, the trial judge remedied this error when he instructed the jury: "Even if you find that the aggravating circumstance outweigh(s) the mitigating circumstance, you may impose a sentence of imprisonment for life or imprisonment for life without parole." Instr. 12 St. Ct. Rec. Vol. 3 at 504. Thus, the jury knew that it could keep Mr. Thornburg off the streets without imposing the death penalty. *See Kelly*, 534 U.S. at 257 n.8 (jury instruction on parole ineligibility could cure problem raised by prosecutor's argument).

### f. Invoking Sympathy for the Victims

Most troubling is Mr. Thornburg's contention that the prosecutor invoked sympathy for the victims during the guilt-phase closing argument:

> Look at Donnie Scott. He's got a good job now. He's obviously off drugs. Who's to say he can't lead a very, very productive life? Who's to say Mr. Poteet, Mr. Shepard couldn't have done the exact same thing?
>
> You know, is Mr. Thornburg today in Court, there's no question about that. Our legal system says this is his day in Court. But this is also our three victims' day in Court. This is Mr. Shepard's, Mr. Poteet and Mr. Smith.
>
> . . . .
>
> Folks, we have three victims here who are not here today. Mr. Shepard, Mr. Smith and Mr. Poteet, they can't get up here and tell you on the witness stand how Mr. Thornburg slaughtered them. Shot

-42-

them and left them to burn alive in the house. They can't get up here to tell us that. They're never going to be here. They're never going to testify. They're never going to be with their families for holidays, Christmases.

And you've got families here. This is also their day in Court, too, not just this defendant.

Tr. IV at 111-12. The prosecutor's comments that the victims may have led productive lives, could not testify at trial, and would never be with their families on holidays were irrelevant to proving Mr. Thornburg guilty of their murders. *See Duckett v. Mullin*, 306 F.3d 982, 991 (10th Cir. 2002) (victim-impact statements improper in guilt stage).

Notwithstanding their clear irrelevance to Mr. Thornburg's guilt, however, the prosecutor's appeal was already implicit in the evidence. The jury knew that there were three men murdered, that they were shot and left in a burning house, and that they could not appear in court to testify. And because the evidence had shown all three victims to be drug and alcohol abusers, the prosecutor's speculation on their possible "productive" lives was most likely an attempt to avoid any jury nullification based on the victims' own reprehensibility. While condemning such comments during the guilt phase, we can doubt their inflammatory impact.

### 3. Cumulative Error Analysis

We now address whether the above errors entitle Mr. Thornburg to relief. The only errors that could have affected the verdict of guilty are the prosecutor's

-43-

possible vouching for witness credibility or lack thereof, his argument that the Andersons' attempt to influence witness testimony was evidence of Mr. Thornburg's guilt, his suggestion of a civic duty to convict, and his invocation of sympathy for the victims. The only errors that could have affected the sentence are the prosecutor's improper reference to the time Dr. Murphy spent with Mr. Thornburg and the prosecutor's possible expression of a personal view that the death penalty was the only appropriate sentence. "A cumulative error analysis aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Wood*, 207 F.3d 1222, 1237 (10th Cir. 2000) (internal quotation marks omitted). We review alleged cumulative error under the same standard required for individual error—here, whether the improper comments as a whole "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974), or rendered the sentencing "fundamentally unfair" in light of the heightened degree of reliability demanded in a capital case. *Le*, 311 F.3d at 1024.

On direct appeal the OCCA reviewed the cumulative effect of all the trial errors (not just prosecutorial misconduct) and held, "While it can be found in the present case that there were some irregularities during the course of the trial, even

-44-

taken together, these cannot be found to have been so great as to have denied [Mr. Thornburg] a fair trial." *Thornburg*, 985 P.2d at 1250. We must defer to this ruling unless it constitutes an unreasonable application of the cumulative-error doctrine. We hold that it is not.

First, the evidence against Mr. Thornburg was very strong. One forced participant in the murders and one victim testified extensively about Mr. Thornburg's role in the murders, the arguments about the drugs, the shootings, and the fire. Teresa Burgess, a totally disinterested witness, testified that she overheard Mr. Thornburg at a bar the night after the murders say, "[T]hree died last night and three more will die tomorrow." Tr. II at 218. The eyewitness testimony was corroborated by witnesses who described the activities of these perpetrators during the night in question—leaving an unaccounted-for gap from 3 a.m. to 6 a.m.; by the testimony indicating Thornburg's anger at Poteet and interest in retribution; and by the expert testimony of the fire investigator and the medical examiner. Mr. Thornburg's alibi defense lay in the testimony of Ruby Davis, Roger Embrey's girlfriend, that he was asleep in his car in their driveway the night of the murders. But that alibi was undermined by Ms. Davis's prior inconsistent statements and the testimony of Huber, Nath, and Teresa Embrey.

In light of the strength of the evidence of guilt, the OCCA could reasonably conclude that the prosecutor's misconduct did not necessitate a new trial.

-45-

As for the sentencing phase, Mr. Thornburg put on only his wife and Dr. Murphy to testify to his drinking problems, his blackouts, and his good qualities as a father and husband. Although the prosecutor erred in referring to the amount of time Dr. Murphy spent with Mr. Thornburg, the jury had already rejected the blackout defense during the guilt phase, and his susceptibility to blackouts is not a particularly compelling mitigating factor. In contrast, the state supported the aggravating factors with evidence that the victims were likely burned alive and consciously suffered, that Mr. Thornburg continued to disrespect authority while in prison and was a continuing threat, and that he put the life of more than one person in danger. The OCCA could reasonably decide that the sentence was not the consequence of any prosecutorial misconduct.

Giving due deference to the OCCA under AEDPA, we cannot set aside the verdict or sentence on the basis of prosecutorial misconduct.

## G. Ineffective Assistance of Trial Counsel

Mr. Thornburg contends that his trial counsel was ineffective for failing to (1) object to the polygraph evidence, (2) object to the hearsay evidence, (3) object to the prosecutorial misconduct, (4) object to improper victim-impact testimony, (5) obtain proper instructions on mitigation and (6) request instructions on voluntary intoxication and first-degree manslaughter.

The familiar *Strickland* standard for ineffective-assistance-of-counsel

claims requires satisfaction of two requirements: (1) a showing that counsel's

representation fell below an objective standard of reasonableness and (2) a

reasonable probability that, but for the errors, the result of the proceeding would

have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

The OCCA reviewed this claim and found counsel's performance deficient, but

held that Mr. Thornburg could not succeed in showing prejudice.

The OCCA held:

> In his eighth proposition, [Mr. Thornburg] contends he was denied effective assistance of trial counsel. Appellant cites as deficient performance trial counsel's failure to object to testimony concerning a polygraph examination, counsel's failure to utilize the defense of voluntary intoxication and request instructions on this defense and the crime of First Degree Manslaughter, counsel's failure to object to inadmissible hearsay, counsel's failure to object to the rebuttal testimony of Teresa Embrey, counsel's failure to object to prosecutorial misconduct, counsel's failure to object to improper victim impact evidence, and counsel's failure to request proper instructions on mitigation. To successfully prove ineffective assistance of counsel, Appellant must show: (1) that defense counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance.
>
> The merits of all but one of the claims set forth in this proposition as ineffective assistance of counsel have been discussed in this opinion. We found in each proposition that error had occurred but because the error had not been met with timely objection from defense counsel relief was not warranted as the error did not rise to the level of plain error. In light of our discussion of the merits of these claims, this Court finds that defense counsel's failure to object to testimony concerning a polygraph examination, counsel's failure to utilize the defense of voluntary intoxication and request instructions on this defense, counsel's failure to object to inadmissible hearsay,

> counsel's failure to object to prosecutorial misconduct, counsel's failure to object to improper victim impact evidence, and counsel's failure to request proper instruction on mitigation rendered his performance deficient. However, because we do not find that Appellant was prejudiced by counsel's deficient performance, relief is not warranted on the claim of ineffective assistance of counsel.

*Thornburg*, 985 P.2d at 1245 (internal citations omitted). In light of the following analysis, we cannot say that the OCCA's decision was contrary to or an unreasonable application of federal law. With respect to the challenged polygraph testimony, we have upheld the OCCA's conclusion that it did not so taint the trial as to render it fundamentally unfair. We have also concluded that most of the challenged hearsay was not actually inadmissible hearsay and the remainder was not so incriminating as to prejudice Mr. Thornburg. And in reviewing the prosecutorial misconduct cumulatively in light of the entire trial, we have upheld the OCCA's conclusion that prosecutorial errors did not so infect the trial as to warrant reversal.

With respect to the two failures of trial counsel that were not appealed to us on the merits—failure to object to victim-impact testimony and failure to request a proper mitigation instruction—Mr. Thornburg fares no better. He contends that his counsel should have objected to the testimony of victim Terry Shepard's daughter and victim Keith Smith's mother. But he does not say why his trial attorney should have objected to the testimony. The witnesses testified only about the effect that the loss of their loved ones had on their lives; they were

instructed by the prosecutor not to comment on the crime, Mr. Thornburg, or appropriate punishments. The Supreme Court has held:

> [I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne v. Tennessee*, 501 U.S. 808, 827 (1991). The complained-of testimony does not appear inconsistent with *Payne*'s limitations. The OCCA reviewed the merits of the victim-impact claim and held, "While the victim impact testimony complained of was speculative in nature and bordered upon impropriety, its focus on emotion was not so overwhelming as to divert the jury from its duty to reach a reasoned response." *Thornburg*, 985 P.2d at 1246.

Turning to the failure to request proper mitigating instructions at the trial's sentencing phase, Mr. Thornburg's brief to our court does not state what instructions should have been given. We infer from his § 2254 application in district court that he desired a specific instruction concerning his alcoholism and organic brain damage. The OCCA ruled on direct appeal, however, that the absence of such a specific instruction was not plain error because a mitigating instruction encompassing intoxication and brain damage was given, *Thornburg*,

985 P.2d at 1249-50, and Mr. Thornburg was not prejudiced by the failure to request such an instruction, *id.* at 1245. The judge instructed the jury:

> Evidence has been introduced as to the following mitigating circumstances:
> The Defendant did not have any significant history of prior criminal activity
> The Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired
> The Defendant was under the influence of mental/emotional disturbance
> The Defendant acted under circumstances which tended to justify, excuse or reduce the crime
> The Defendant's age
> In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well.

Sentencing Instr. 11; St. Ct. Rec. at 503. In light of that instruction, the OCCA's ruling was not an unreasonable application of federal law.

Only one subissue of Mr. Thornburg's ineffective-assistance-of-counsel claim gives us pause: counsel's failure to request a voluntary-intoxication-defense instruction. Although the OCCA ruled on his appeal that the evidence did not support a voluntary-manslaughter instruction because of the absence of provocation, Oklahoma courts have on occasion said that voluntary intoxication can reduce first-degree murder to first-degree manslaughter. *See Pickens v. State*, 885 P.2d 678, 682-83 (Okla. Crim. App. 1994), *overruled on other grounds by Parker v. State*, 917 P.2d 980 (Okla. Crim. App. 1996). Had Mr. Thornburg

-50-

requested a voluntary-intoxication instruction, he may have received an instruction on a lesser included offense.

But regardless of the requirements of Oklahoma law, the decision to forego the voluntary-intoxication instruction was not objectively unreasonable. Mr. Thornburg relied on the alibi that he had passed out in his car parked in the Embreys' driveway the night of the murders. His attorney could have viewed the voluntary-intoxication defense as a long shot requiring the jury to believe that Mr. Thornburg was at the scene of the crime but was too intoxicated to know what he was doing. Although the alibi defense turned out to be weak, belatedly raising an inconsistent defense could further weaken what little there was of the defense he had.

Moreover, there is no reasonable probability that the jury would have found the defense persuasive. It convicted Mr. Thornburg despite a barrage of evidence of his intoxication and an instruction on the requirement that it find malice aforethought. Even without deference to the OCCA, we hold that counsel was not ineffective for failing to request a voluntary-intoxication instruction.

## H. The Eye-for-an-Eye Carving

Behind the judge's bench in the courtroom in which Mr. Thornburg was tried was a wooden carving on which appears the phrase, "An Eye for an Eye & A Tooth for A Tooth." Mr. Thornburg contends that the presence of this carving in

the courtroom was structural error automatically requiring reversal. The phrase "an eye for an eye and a tooth for a tooth," according to Mr. Thornburg, is widely invoked by proponents of the death penalty and has the potential to sway a jury to impose a death sentence, not as a result of the individualized judgment that our constitutional law requires, *see Woodson v. North Carolina,* 428 U.S. 280, 304 (1976), but because of religious commandment. He also contends that his trial counsel was ineffective for not raising the issue at trial and his appellate counsel was ineffective for failure to raise the issue (both on the merits and as a ground of ineffective assistance of trial counsel) on appeal.

Mr. Thornburg's merits claim and his claim of ineffective assistance of trial counsel, however, face the hurdle of procedural bar. Mr. Thornburg failed to advance either claim in state court until his petition to the OCCA for postconviction relief. The OCCA refused to review the claims, applying a state procedural bar for failing to raise an issue that could have been raised on direct appeal. See *Thornburg v. State*, No. PC-99-490 at *3.

In a § 2254 proceeding a state court's prior "adequate and independent finding of procedural default will bar federal habeas review of the federal claim." *Harris v. Reed*, 489 U.S. 255, 262 (1989). We have had several occasions to express concern about whether Oklahoma's procedural bar is "adequate and independent," particularly with respect to ineffective-assistance claims, *see*, *e.g.*,

*Cannon v. Mullin*, 383 F.3d 1152, 1172-74 (10th Cir. 2004) (for state rule of procedural bar to be adequate to bar claim of ineffective trial counsel because of failure to raise claim on direct appeal, state must provide procedural mechanisms permitting defendant to develop factual basis of claim on appeal), *cert. denied,* 125 S. Ct. 1664 (2005); but Mr. Thornburg, who had new counsel for the direct appeal of his conviction, does not challenge independence and adequacy here. *See Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999) (defendant bears burden of contesting independence and adequacy of state procedural bar once state has asserted the affirmative defense).

An adequate and independent finding of procedural default can be overcome only if the party claiming error can establish cause for failure to raise the issue when required and show that the failure produced actual prejudice. *Engle v. Isaac*, 456 U.S. 107, 129 (1982). "While the nature of a constitutional claim may affect the calculation of cause and actual prejudice, it does not alter the need to make that threshold showing." *Id.* Thus, even structural errors are subject to state procedural bars. *See McCraken v. Gibson*, 268 F.3d 970, 976 (10th Cir. 2001) (state procedural bar applied to allegation of structural error, although court alternatively addresses the merits and holds that error was not structural).

As cause for the failure to raise the issue on direct appeal, Mr. Thornburg claims ineffectiveness of his appellate counsel. The OCCA rejected this ineffective-assistance-of-appellate-counsel claim in Mr. Thornburg's postconviction proceedings: "The brief filed in [Mr. Thornburg's] direct appeal reflects that appellate counsel raised eighteen non-frivolous claims at least equally meritorious to that which was omitted and is at issue here. We cannot find that appellate counsel's failure to investigate and litigate the . . . issue as fully as [Mr. Thornburg] claims he should have rendered counsel's performance unreasonable under prevailing professional norms." *Thornburg v. State*, No. PC-99-490, at *5 (Okla. Crim. App. Nov. 9, 1999) .

Regardless of the merits of the OCCA's analysis, we agree that Mr. Thornburg's appellate counsel was not ineffective for failure to raise the biblical-reference issue. Appellate counsel is not ineffective for failing to raise an argument based on facts that he could not reasonably be expected to know. Not only was the presence of the biblical reference in the courtroom not obvious from the trial record, it was completely absent. For appellate counsel even to be aware of the issue, he would have had to assume a duty to visit the courtroom in which Mr. Thornburg was tried. Appellate attorneys work from a trial record, and we will not impose on them a duty to inspect courtrooms. Mr. Thornburg's trial counsel did not object to the carving; that may have been poor judgment, but it

-54-

left the record devoid of anything that could have directed appellate counsel's attention to the eye-for-an-eye language. The prosecutor did make a reference to the sword in closing argument: "Talk about the sword of mercy. It's above Judge Winchester. The sword there. You live by the sword, you die by the sword, folks." Tr. IV at 205. But he did not mention the phrase engraved on the sword. Mr. Thornburg even candidly admits as much in his brief to this court:

> The error of the ever-present adage "An Eye for an Eye, A Tooth for a Tooth," should have been objected to by trial counsel, and should have been asserted on direct appeal by appeal counsel. To be sure, the error is not apparent from the record. There is nothing in the paper record of Mr. Thornburg's trial to indicate that the artwork containing the Leviticus passage was in front of the jury. Trial counsel failed to make that record. Direct appeal counsel would not have known of the error, even investigating the case, as a reasonable investigation would not normally take the direct appeal lawyer into the courtroom in which the trial was conducted.

Aplt. Br. at 49. Accordingly, we reject on the merits Mr. Thornburg's claim of ineffective appellate counsel. As a consequence, Mr. Thornburg is procedurally barred from raising the biblical-reference issue or the related claim of ineffective trial counsel.

## I. Denial of an Evidentiary Hearing

Finally, Mr. Thornburg appeals the district court's denial of his request for an evidentiary hearing on his Sixth Amendment issues. Mr. Thornburg has shown no reason to conduct an evidentiary hearing. He does not state what he wishes to prove at such a hearing and he argues no issues on appeal for which further

evidence would be relevant. The district court did not err in denying his evidentiary-hearing request.

## III.  CONCLUSION

We AFFIRM the district court's denial of relief under 28 U.S.C. § 2254.