FILED
United States Court of Appeals
Tenth Circuit

August 12, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KELI E. HARGROVE,

Petitioner - Appellant,

v.

MILLICENT NEWTON-EMBRY,

Respondent - Appellee.

No. 06-6217
(D. C. No. CIV-04-1408-F)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

Petitioner-Appellant Keli Hargrove appeals the district court's denial of her petition for a writ of habeas corpus. In a previous order, we granted a certificate of appealability ("COA"). Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and § 2253(c), we AFFIRM the district court's decision denying habeas relief.

**I. BACKGROUND**

On February 23, 1999, the body of a young woman was discovered in a ditch on the side of a road in Pottawatomie County, Oklahoma. The body was tied in a fetal

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

position with a nylon rope, which was wrapped around the neck and ankles. The legs, back, and arms were charred, and a black plastic trash bag had melted to the skin as a result of an attempt to burn the body. The body was unidentified until, two months later, the Oklahoma City Police received a phone call that led them to identify the body as that of Christina Hargrove ("Tina"), the twenty-one-year-old, mentally disabled stepdaughter of Ms. Hargrove.

This same phone call led the police to suspect Ms. Hargrove in the death of Tina. Agents from the Oklahoma State Bureau of Investigations ("OSBI") eventually located Ms. Hargrove and Charles Hargrove, who is Ms. Hargrove's husband and Tina's father. The Hargroves voluntarily accompanied the agents to headquarters and were separately questioned. They were not advised of their constitutional rights prior to questioning. Ms. Hargrove initially denied having any knowledge regarding Tina's death, claiming that Tina had "run off" with a man who worked at a carnival. After further questioning, however, Ms. Hargrove told an OSBI agent that Tina died as a result of injuries she sustained in a physical fight with Ms. Hargrove.

According to the agent's trial testimony, Ms. Hargrove provided the following account of Tina's death. On the day Tina died, they had a physical fight. After the fight began, Mr. Hargrove left the house, leaving his wife and Tina home alone. Subsequently, Tina threw a plate, hitting Ms. Hargrove in the head. Ms. Hargrove began chasing Tina, who ran out of the house and returned with a T-post (i.e., a metal fence post). After taking the T-post from Tina, Ms. Hargrove hit her in the face with it. Tina fell to the

floor, after which Ms. Hargrove struck her in the face as many as four times with the T-post. For up to two hours, Tina lay on the floor bleeding before she stopped breathing. Her face was badly damaged, and she was missing many teeth. Ms. Hargrove then put Tina's body in trash bags, which she placed in a trash can. When Mr. Hargrove returned home, she asked him to put the trash bags in the trunk of her car. Later that night, after stopping at a convenience store for gas and some beer, she laid Tina's body in a ditch off the side of the road in a neighboring county.

When questioned, Mr. Hargrove told a different OSBI agent that he left the house for two to four hours after the fight between Ms. Hargrove and Tina began. When he returned, Ms. Hargrove and her son, Christopher, were at home. At Ms. Hargrove's request, Mr. Hargrove put several trash bags in the trunk of her car. He told the agent that Ms. Hargrove then left to take a friend to a bowling alley, and he stayed home. He also reported that Ms. Hargrove told him that Tina had run off with a carnival worker.

Both Ms. Hargrove and Mr. Hargrove were arrested. Mr. Hargrove pleaded guilty to the charge of accessory to murder based on his actions in helping his wife dispose of the body and cover up the crime. Ms. Hargrove was charged with first degree malice aforethought murder under Oklahoma law, *see* Okla. Stat. tit. 21, § 701.7, and tried by jury in state court. The only issue at trial was whether Ms. Hargrove killed Tina with the deliberate intent necessary to support the first-degree murder conviction or whether the killing occurred in a heat of passion such that she should be found guilty of the lesser offense of manslaughter. In support of the state's case, the OSBI agent testified about the

statements Ms. Hargrove made during questioning. When Ms. Hargrove testified, however, she claimed that some of the agent's testimony was false. She offered a modified version of the story, contending that a mutual fight escalated out of control and she killed Tina in a heat of passion. During her trial testimony, she also denied having any role in disposing of Tina's body, claiming that she called a friend who came over and removed Tina's body from the home. Despite Ms. Hargrove's claim that she did not intend to kill Tina, the jury found her guilty of murder in the first degree and sentenced her to life in prison without the possibility of parole.

Ms. Hargrove appealed to the Oklahoma Court of Criminal Appeals ("OCCA"), which affirmed her conviction. The OCCA held that the trial court erred in admitting her statements to the OSBI agent, but determined that this error was harmless. The OCCA also held that the trial court erred in admitting other evidence, but concluded that individually each of these errors was harmless. In addition, although the court characterized the cumulative impact of the errors as a "closer call," it ultimately did not grant relief based on cumulative error. One judge dissented from this holding.

After her conviction was upheld by the OCCA, Ms. Hargrove, appearing pro se, filed a petition for habeas relief in federal district court pursuant to 28 U.S.C. § 2254. Adopting the report and recommendation of the magistrate, the district court denied her request for relief. Ms. Hargrove appealed to this Court, and we granted a COA to consider the following two issues:

1.    Was the admission of petitioner's statements to police on April 28,

- 4 -

1999 while in police custody and without being advised of her constitutional rights a violation of the Fifth, Eighth, and Fourteenth Amendments?

2. Whether the accumulation of error in this case constitutes a deprivation of due process of law and necessitates reversal under the Fourteenth Amendment?

*Hargrove v. Newton-Embry*, No. 06-6217, Order (Mar. 16, 2007).

## II. DISCUSSION

Both issues on appeal require us to address the prejudicial impact of constitutional error in a state-court criminal trial.[1] Because the OCCA adjudicated both these claims on the merits, we may grant relief only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

In *Fry v. Pliler*, the Supreme Court clarified the standard we are to apply in § 2254 habeas proceedings when assessing the effect of constitutional errors: "We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*." 127 S. Ct. 2321, 2328 (2007). As the Court emphasized, this standard applies "whether or not the state appellate court recognized the error and reviewed it for

---

[1] The respondent does not challenge any of the OCCA's determinations of error. Therefore, our review is limited to assessing the impact of these errors on Ms. Hargrove's trial.

harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." *Id.*; *see also Brown v. Sirmons*, 515 F.3d 1072, 1084–85 (10th Cir. 2008) (applying the substantial-and-injurious-effect standard to determine the effect of a trial court's constitutional error when the state appellate court recognized and reviewed the error for harmlessness). Under the *Brecht* standard, we ask whether an error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631, 638 (1993) (quotation omitted).

A.      Admission of Unwarned Statements

Because Ms. Hargrove was not advised of her constitutional rights prior to custodial interrogation, the OCCA determined that the trial court committed a constitutional error in admitting her unwarned statements to the OSBI agent. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The court concluded, however, that the error was harmless beyond a reasonable doubt, citing the considerable trial testimony supporting the state's theory that Ms. Hargrove intended to kill Tina.[2] As we explain below, we agree that this error does not warrant relief.

---

[2]In analyzing the impact of the admission of her unwarned statements, Ms. Hargrove discusses the use of her statements to impeach her testimony on cross-examination, in addition to their introduction in the prosecution's case-in-chief and closing argument. The OCCA did not, however, hold that the prosecution's use of these statements during cross-examination constituted error, and this determination was not an unreasonable application of clearly established federal law. *See Harris v. New York*, 401 U.S. 222, 225-26 (1971) (holding that voluntary statements obtained in violation of *Miranda* are admissible at trial to impeach a defendant's testimony). We are therefore concerned only with the introduction of her unwarned statements during the prosecution's case-in-chief and closing argument.

To convict Ms. Hargrove on the charge of first-degree murder, the jury had to find that she caused Tina's death with "malice aforethought." Okla. Stat. tit. 21, § 701.7(A). "Malice" is defined as "deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." *Id.* The requisite intent "may be formed instantly before committing the act by which it is carried into execution." *Id.* § 703. Moreover, in deciding whether a defendant has the requisite intent to commit malice-aforethought murder under Oklahoma law, a jury may "draw inferences of subjective intent from a defendant's objective acts." *Young v. Sirmons*, 486 F.3d 655, 666 (10th Cir. 2007) (quotation omitted). Consequently, a jury may reject the defendant's denial of intent if it seems "improbable" given all the circumstances. *Id.*

At trial, Ms. Hargrove claimed that she never intended to kill Tina. According to her trial testimony, she and Tina engaged in a physical fight that escalated out of control. She testified that her son intervened after she took the T-post from Tina and struck her with it three or four times and that, when he did, Tina was still standing and did not appear to be seriously hurt. About an hour later, Ms. Hargrove went into Tina's room and discovered she was not breathing. She then called a friend who disposed of Tina's body while she waited at a bar. To corroborate Ms. Hargrove's version of the fight, the defense introduced the preliminary-hearing testimony of her son, who claimed that he saw his mother hit Tina two times with the T-post before he intervened and stopped the fight.

With the exception of her son's testimony, however, the evidence introduced at

trial did not support Ms. Hargrove's claim that she did not intend to kill Tina. Indeed, the trial record contains considerable evidence—none of which differs in material respects from the OSBI agent's testimony about her confession—from which a jury could draw inferences of Ms. Hargrove's subjective intent to kill her stepdaughter. Significantly, the jury heard the testimony of two witnesses in whom Ms. Hargrove allegedly confided. According to Shirley Fennell, an inmate Ms. Hargrove met while in the Oklahoma County Jail, Ms. Hargrove told her that Tina tried to get away by running out the back door, but Ms. Hargrove stopped her and began beating her "like a shark in an eating frenzy." Ms. Fennell also testified that Ms. Hargrove said "it felt good" to beat Tina and she would kill Tina again "for all the grief that she's caused her." In addition, according to Ms. Fennell, Ms. Hargrove knocked out Tina's teeth so no one could identify the body. Ms. Fennell's testimony also included details concerning Ms. Hargrove's attempt to cover up the crime and Mr. Hargrove's involvement. Although Ms. Hargrove denied telling Ms. Fennell about the crime, the prosecution demonstrated that some of the details Ms. Fennell testified she learned from Ms. Hargrove were not disclosed to the public through the media.

The jury also heard the testimony of Christina Fann, the daughter of Ms. Hargrove's best friend. She testified that Ms. Hargrove told her that she killed Tina by hitting her in the head with a sledgehammer after Tina walked in while Ms. Hargrove and some friends were doing drugs. She also testified that Ms. Hargrove watched Tina lay on the floor for ten or fifteen minutes before she died and that Ms. Hargrove explained how

she tied Tina up with ropes and then put her body in trash bags and later burned the body. In addition, Ms. Fann testified that she lived with the Hargroves for a short time, and during this time, she witnessed Ms. Hargrove hit Tina with various objects on different occasions. She also testified that Ms. Hargrove generally treated Tina differently from the other children in the family, making her sleep outside in a shed and calling her obscene names.

Indeed, the jury heard several witnesses testify that Ms. Hargrove disliked Tina and treated her "like a slave." One witness testified that she heard Ms. Hargrove say more than five times that she would like to kill Tina. Other witnesses, who had lived with the Hargroves for periods of time, described Ms. Hargrove's serious physical and verbal abuse of Tina, as well as Tina's apparent fear of her stepmother.

In addition to testimony regarding Ms. Hargrove's statements and treatment of Tina, the jury heard evidence concerning Tina's injuries and the condition of her body. The medical examiner testified that Tina sustained multiple blunt-force head injuries, including several lacerations to her face, one laceration to the back of her head, and one laceration to the back of her ear. She also had a fractured jaw, missing teeth, and a broken right leg bone, as well as four defensive-type wounds on her left palm. The examiner testified that these injuries could have been caused by a metal fence post. Although Ms. Hargrove admitted at trial that she struck Tina three or four times with the T-post, she could not explain how Tina sustained the multiple injuries that the medical examiner described in his testimony.

In sum, the jury heard considerable evidence supporting the inference that Ms. Hargrove killed her stepdaughter with deliberate intent. In particular, according to two witnesses, Ms. Hargrove confessed the details of her crime without indicating any lack of intent. Moreover, the testimony of the medical examiner included a catalogue of serious injuries inconsistent with Ms. Hargrove's trial testimony. In light of this evidence, we conclude that the erroneous admission of Ms. Hargrove's unwarned statements did not have substantial and injurious effect or influence in determining the jury's verdict.

B.      Cumulative Error

The OCCA identified five individual errors that did not warrant reversal: (1) the admission of Ms. Hargrove's unwarned statements; (2) the admission of improper character evidence; (3) the cumulative admission of graphic photographs of Tina's body; (4) the admission of OSBI agents' testimony as to the truthfulness of Ms. Fennell; and (5) the admission of testimony regarding Mr. Hargrove's prior consistent statements. After concluding that each of the individual errors was harmless, the OCCA considered the cumulative effect of the errors and determined that their impact did not require reversal of the conviction.

As we do with individual errors, we assess the prejudicial impact of cumulative error under the substantial-and-injurious-effect standard. *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) ("Cumulative-error analysis is an extension of the harmless-error rule, and is determined by conducting the same inquiry as for individual error.") (quotation ommitted). To decide whether these errors "had substantial and injurious

- 10 -

effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 631 (quotation omitted), we aggregate the errors: "A cumulative error analysis aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Bland v. Sirmons*, 459 F.3d 999, 1029 (10th Cir. 2006) (quotation omitted). Unless the errors, considered collectively, "had substantial and injurious effect or influence in determining the jury's verdict, the [cumulative] error is harmless." *Brown*, 515 F.3d at 1084 (quotation omitted).

Having aggregated the errors identified by the OCCA, we conclude that they did not have a substantial and injurious effect on the jury's verdict. First, as explained above, the admission of Ms. Hargrove's unwarned statements did not influence the verdict given the considerable evidence supporting the state's theory that Ms. Hargrove intended to kill Tina. Furthermore, although the trial court erred in admitting some character evidence, the majority of the character evidence was admissible; the OCCA held that the character evidence involving Ms. Hargrove's mental and physical abuse of Tina was admissible as relevant evidence of her motive and intent.[3] The remaining character evidence, which the

---

[3]Although Ms. Hargrove does not challenge the OCCA's conclusion that the evidence of abuse was admissible in her supplemental brief, she does challenge its admissibility in her pro se brief filed in support of her request for a COA. The crux of her argument, however, is that the admission of this evidence violated state law, an argument we will not consider on habeas review. *Thornburg v. Mullin*, 422 F.3d 1113, 1128–29 (10th Cir. 2005) ("Federal habeas review is not available to correct state law evidentiary errors . . . . The appropriate inquiry in this proceeding is whether the admission [of the evidence] rendered the proceeding fundamentally unfair." (quotation and citation omitted)). She also cites this evidence in arguing that the "sheer volume" of inadmissible

OCCA determined was improperly admitted, involved Ms. Hargrove's use of drugs, abuse of her husband, theft of a prescription pad, and misappropriation of Tina's monthly disability checks. In light of the particularly strong evidence of Ms. Hargrove's intent to kill Tina, the admission of this evidence had little to no prejudicial impact.

The prejudicial impact of the improperly admitted photographs was also negligible. The OCCA concluded that four or five of the eighteen photographs of Tina's body were admissible to show the location of Tina's wounds and the condition of the body. The OCCA determined that the remaining photographs were inadmissible, not because their probative value was substantially outweighed by the risk of unfair prejudice, but rather because the photos are "nearly identical" to the admissible photos and therefore cumulative. Relatedly, the OCCA also acknowledged—and we agree—that the admissible photographs were themselves extremely gruesome, thereby undercutting any argument that the improperly admitted photographs tipped the scale in the prosecution's favor.

Lastly, we conclude that the admission of testimony concerning Ms. Fennell's truthfulness and Mr. Hargrove's prior consistent statements did not influence the jury, and these errors therefore add little, if any, weight to the prejudicial impact of the errors

---

character evidence deprived her of a fair trial. But given that Ms. Hargrove's mental state was the critical issue at trial, evidence of her increasingly violent behavior toward Tina had probative value, and we cannot conclude that the OCCA unreasonably applied federal law in deciding that this evidence was admissible. *See id.* at 1129.

considered collectively.[4]  After the OSBI agents testified that Ms. Fennell was truthful, the court sustained one of the objections to this testimony, and on one occasion, admonished the jury not to consider the testimony.  *See United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008) ("[W]e generally presume that juries follow courts' instructions.").  In addition, the prejudicial effect of the testimony concerning Mr. Hargrove's prior consistent statements was insignificant, particularly given its focus on the Hargroves' attempt to cover up the crime, rather than the physical violence that caused Tina's death.

In light of the particularly strong evidence of Ms. Hargrove's deliberate intent to kill Tina, we conclude that these errors did not have substantial and injurious effect or influence in determining the jury's verdict.  The cumulative error is therefore harmless, and we decline to grant relief.  *See Thornburg v. Mullin*, 422 F.3d 1113, 1138 (10th Cir. 2005) (holding that habeas petitioner was not entitled to relief based on cumulative error given the "strength of the evidence of guilt").

---

[4]In her supplemental brief, Ms. Hargrove does not include these two errors in her cumulative-error argument, focusing instead on the collective effect of the inadmissible character evidence, cumulative photographs, and unwarned statements.  She does, however, make a general reference to "other errors," and in her pro se brief in support of her application for a COA, she aggregated all five errors identified by the OCCA.

## III.  CONCLUSION

Accordingly, we AFFIRM the district court's decision to deny habeas relief.


ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge